*LANSING *against* SMITH and others.(a)

CASE against the acting commissioners under the stat-
ute, (sess. 46, ch. 111,) for erecting the Albany basin, by
which the plaintiff alleged he was injured; tried at the
Albany circuit, February 7th, 1826, before DUER, C. Judge.

The plaintiff was non-suited by the judge, who sealed a
bill of exceptions presenting the grounds of the non-suit,
which, with the facts of the case, will be found stated in
the opinion of the court.

A motion was made upon this bill, to set aside the non-
suit, and for a new trial.

*S. M. Hopkins* and *J. W. Cushman,* for the motion.

*Talcot,* (attorney general,) and *J. King,* contra.

*Curia, per* SUTHERLAND, J. Three questions arise upon
this bill of exceptions:

1. Is the act of the 5th of April, 1823, "authorizing the
construction of a basin in the city of Albany, at the termi-
nation of the Erie and Champlain canals," constitutional?

2. Was the erection of the temporary bridges and the
sloop lock, of which the plaintiff complains, authorized by
that act? And

The s(ess.
(sess. 
111,)
izing t
structi
basin
Huds
in th
Alb
ere
w
d
o
di
ab
re
cess
easily ap-
proached by
vessels, &c.,
and, therefore,
much depreci-
ated in value,
though it pro-
vided no com-
pensation for
such a conse-
quence, is not
unconstitu-
tional, either as
taking private
property for
public use
without just
compensation,
or impairing
the obligation
of contracts.

This not being a direct invasion of private property, but remote and consequential
merely, and arising from a public improvement, the injury is one to which individuals must
submit as the price of the social compact; and in the eye of the law, the injury is *damnum
absque injuria.*

The erection of temporary bridges running from the main land, for the purpose of con-
veying dirt and other materials to be used in forming a pier for the basin and the sloop
lock, were authorized by the statute.

But if erections working a common injury to the owners of docks, &c., above, were un-
authorized by the statute, yet no action would lie at the suit of an individual, though he
should show his share of the common injury to be greater than that of others; for the
Hudson at the place, being a public highway, some injury from the erections, peculiar and
personal to the party, is necessary to sustain the action.

The injury being common to a large class of the community, it is the subject of indict-
ment only, as a common nuisance.

The authorities distinguishing what is such an injury peculiar and personal to the party,
as will sustain a private action for a public nuisance, cited, considered and applied, per
SUTHERLAND J., delivering the opinion of the court.

(a) This cause was decided in October term, 1827.

ALBANY,
Feb. 1828.

Lansing
v.
Smith.

utional
on.

*3. Admitting the act to be unconstitutional, or the erec‑ tions complained of to be unauthorized by it, is the injury to the plaintiff of such a nature as will enable him, under the circumstances disclosed in the case, to sustain this ac‑ tion?

The act is said to be unconstitutional on two grounds: 1. As violating the 7th section of the 7th article of our state constitution, by which it is declared, "that private prop‑ erty shall not be taken for public use, without just compen‑ sation;" and 2. As repugnant to the 10th section of the 1st article of the constitution of the U. S. which ordains, " that no state shall pass any bill of attainder, *ex posto facto law, or law impairing the obligation of contracts.*"

Both these objections are founded upon the rights which are supposed to have been acquired by Walter Quacken‑ bush, under the grant from the state (of the 21st of Septem‑ ber, 1804,) of the land then under water, upon which the plaintiff's dock was subsequently erected. The patent par‑ ticularly describes the lot intended to be granted, and con‑ veys it "with all and singular the rights, hereditaments and appurtenances to the same belonging, or in any wise apper‑ taining." It is conceded by the plaintiff, that no part of the land thus granted to Quackenbush, had been taken or encroached upon in the erection or continuance of the pier. But it is contended that the beneficial enjoyment of his dock has been essentially impaired by that operation; and that Quackenbush acquired, as appurtenant to his grant, a right of way by water to and from his dock, and also a right to have the water of the river flow along the premises conveyed, in its natural course, undiverted and undimin‑ ished. That the grant from the state constituted a contract between the state and Quackenbush, the obligation of which has been impaired by the pier act in these essential partic‑ ulars.

The act, (sess. 46, ch. 111,) provides compensation for the only direct injury, which it contemplated as likely to accrue to the owners of the adjacent land, from the erection [*148] of the pier. The operation did not require that the *ad‑ jacent lands should be taken, or permanently occupied.

But it was supposed that those lands might be overflowed by reason of the erection of the pier and lock; the 11th section of the act accordingly directs the manner in which the extent of such injury may be ascertained, and provides a fund for its payment. Any interference with the corporate rights of the city of Albany, is also effectually guarded against by the 12th section of the bill, which declares, that unless the corporation shall file their consent to the bill, within sixty days after the passing of the same, with the secretary of state, it shall be void.

So far, therefore, as it depends upon the direct and positive provisions of the act, the legislature have evinced a studious desire to avoid all interference with vested rights; and to make ample compensation for any injury which might accrue to private property.

If the act be unconstitutional, it must be on the ground that the plaintiff had, either at common law, as owner of the adjacent soil, or by virtue of the patent from the state to Quackenbush, for the land under water opposite to the shore, a claim to the natural flow of the river, with which the state had no right to interfere by any erections in the bed of the river, or in any other manner. This proposition appears to the court too extravagant to be seriously maintained. It denies to the state the power of improving the navigation of the river by dams, or any other erections, which must affect the natural flow of the stream, without the consent of all the proprietors of the adjacent shore, within the remotest limits which may be affected by the operation. Every new dock which is erected, partially diverts the natural course of the stream ; and upon the principle contended for by the plaintiff, violates the rights of all the proprietors of docks below it.

The right of the plaintiff to navigate to and from his dock, is not denied. All that is contended for on the part of the defendants is, that the mode in which that right is to be exercised, is subject to be controlled and regulated by the legislature, as, in their judgment, the interest and convenience of the public may require. In all such

*regulations, a due regard is undoubtedly to be paid to the interest of individuals. But every great public improvement must, almost of necessity, more or less affect individual convenience and property ; and where the injury sustained is remote and consequential, it is *damnum absque injuria*, and is to be borne as a part of the price to be paid for the advantages of the social condition. This is founded upon the principle that the general good is to prevail over partial individual convenience. If the patent to Quackenbush is to be considered as a contract between him and the state, it is not perceived that its obligation is violated by the act in question. There was no implied promise on the part of the state, (as seems to be supposed by the counsel for the plaintiff,) not to erect, nor to afford facilities to others for erecting rival establishments, like the pier, with greater advantages for the transaction of business, than were possessed by the docks on the main land. The granting of a part of the land which belonged to them under water, could afford no foundation for the inference that they intended in any manner to restrict or impair their right to dispose of, or improve the residue.

We are, therefore, of opinion, that there is no foundation for the constitutional objections which have been raised to the act in question.

But admitting the act to be constitutional, it is contended, that it did not authorise the erection of the temporary bridges.

Objection that the powers conferred by the statute had been exceeded. (Vid. sess. 46, ch. 111.) The provisions of the act are general. It gives no particular directions as to the manner in which the pier is to be constructed. It is to extend from the state arsenal dock, to a point opposite to Hodge's dock, in the line of Hamilton street. The board of Commissioners are authorised to raise the requisite funds by subscriptions ; *and to adopt all such measures as they may deem necessary and proper, for the attainment of the object contemplated by the act.* Whether the pier is to be constructed of stone, or of wood and earth, and how the materials used are to be brought where they are required, whether by land or by water, is left entirely

to the discretion of the *commissioners, under the general provision which has already been stated. Although the funds for this operation are to be raised, in the first instance by individual subscription, yet the whole act contemplates it as a public work not only extremely beneficial to the trade of the city of Albany, but a great accommodation to the public at large. The ninth section of the act treats it as an extension, or part of the great canal; and directs the canal commissioners to charge tolls on all canal boats, craft and lumber, which shall enter into the basin from the canal, or which shall leave the basin for transportation on the canal, computing the entire length of the basin, in the same manner as if it were part of the canal. And the 10th section provides, that the grant of the land under water, on which the pier is to be erected, shall be made on condition, that if the legislature shall, within five years, make provision by law, for the repayment of the amount expended, in erecting the mole or pier, &c., then the grant is to be absolutely void, and the whole property of course to vest in the state.

The construction of the pier, then, was not a mere private operation, in which the public had only a remote and consequential interest. It was essentially a public work; and the law which authorised its erection, is to be liberally construed, when the acts of the commissioners, (who may be considered as public agents,) in carrying it into effect, are called in question.

It appears from the evidence in the case, that the temporary bridges were erected for the purpose of carrying the dirt to the pier, with which it was filled in; and that the filling in was effected by means of the bridges for 25 per cent. less than it would have cost without them.

It is to be borne in mind, that the bridges did not encroach upon the plaintiff's property; that they were temporary erections; and that the only injury of which the plaintiff complains is, that while the bridges remained, his wharf could not be approached by sloops and steamboats. The damage of the plaintiff, if any, was not direct, but remote and consequential.

ALBANY,
Feb. 1828.

Lansing
v.
Smith.

ALBANY,
Feb. 1828.

Lansing
v.
Smith.

\*Under all the circumstances of the case, we are of opinion, that the bridges were a proper and necessary means for carrying into effect the object of the legislature, within the true intent and spirit of the act; that the inconvenience, if any, experienced by the plaintiff, was one of the ordinary and almost inevitable consequences which result, not only from public, but private improvements, to the owners of contiguous property; that where those inconveniences are consequential, slight and temporary, it is *damnum absque injuria*, for which no action can be sustained. The case at bar is, in principle, strongly analogous to that put by the counsel for the defendants, of the injury or inconvenience sustained by the proprietor of a store, from the erection of a new building on the adjacent lot. The side walk is broken up, the street is obstructed, and the approach to the store rendered inconvenient, if not dangerous, for carriages. The lime and sand, and dust from the building, are blown into the store; and customers are deterred by all these circumstances from frequenting it. But an action, I apprehend, has never been sustained or brought for such an injury. And yet it could not be justified on the ground of strict necessity. The brick and stone, and timber, might have been brought as they were required to be used; and the mortar might have been compounded elsewhere.

But if the erections complained of, were unauthorised, we are still of opinion that the plaintiff has shown no injury resulting from them, which will enable him to sustain this action; that they are common nuisances, for which no private action can be maintained.

The erections were not the subject of private suit, because a common nuisance.

The general principle is not disputed, that for a common nuisance, an action cannot be sustained, except by a person who has suffered some special damage. The law gives no private remedy except for a private wrong. So long, therefore, as a nuisance affects only the public at large, it is to be redressed by indictment only; because the damage being common to all, no one can assign his particular proportion of it; and if he could, it would operate most oppressively, and be against public policy, to suffer the mul-

tiplicity *of actions which might result from it. (3 Bl. Com. 219, 20.)

But although this general rule is admitted, the nature and extent of a private injury resulting from a public nuisance, which will authorise and sustain a private action, has been the subject of various and discordant opinions.

That the obstructions of which the plaintiff complains, if illegal, constitute a common or public, as distinguished from private nuisance, it appears to me there can be no doubt.

The right to navigate that portion of the Hudson river, which is now included within the pier, was not, previous to the erection of the pier, peculiar to the owners of property lying on the adjacent shore. It was a right common to all the citizens of the state, founded on the fact that the Hudson river was a public navigable stream, and, as such, a common highway which all had a right to traverse. Suppose, for a moment, that these erections had been made by an individual, without the color of authority from the legislature; can there be a question that they would have been indictable as a public nuisance? They undoubtedly obstruct the river; and render a portion of it innavigable, which no individual has a right to do without the consent of all, expressed by their common representatives. The legal character of the nuisance is not changed from public to private, because its operation is more injurious to a particular individual or a class of individuals, than to the community at large.

A ditch dug in a public highway, which, from the local circumstances of the country, is seldom or ever used but by one or more families, is still a public nuisance, not because any considerable portion of the public is actually affected by it, but because it obstructs a passage which all have a right to use.

The plaintiff, as proprietor of a dock within the basin, is not entitled to navigate the basin in a manner different from those who have no such local interest. He has *prima facie*, a right to approach and depart from his dock, in

ALBANY,
Feb. 1828.

Lansing
v.
Smith.

*the ordinary mode of navigation; and so has every sloop and boat upon the river; and the plaintiff's case is distinguished from that of the community at large; in having suffered, as he alleges, an extraordinary damage peculiar to himself, in addition to that which he sustains in common with the public.

It is, then, the case of an individual complaining of an act, which, if unauthorised, is a public nuisance, seeking a private satisfaction by action, for the injury which that nuisance has produced to him individually; and the important question is, whether the pleadings and the proofs bring this case within the well established principle, that where a private person suffers some extraordinary damage beyond the rest of the community, by a public nuisance, he shall, under certain circumstances, have a private satisfaction by action.

The foundation of every such action is the special damage. The nuisance, *per se*, gives no cause of action. It is strictly analogous to an action of slander for words not actionable in themselves, or an action by a master for the beating of his servant, or of a parent for the debauching of his daughter. In all these cases, the *gist* of the complaint is the special damage. It is that, and that alone which entitles the plaintiff to recover. It is to the part of the declaration, therefore, setting out the special damage, that we must look to ascertain the ground on which the plaintiff places his action.

Declaration.
1st count.

The first count of the declaration alleges that the plaintiff was seised of a dock or wharf, &c., situated in the 5th ward of the city of Albany, near to, and adjoining the river Hudson, &c., and was entitled to a free and uninterrupted navigable communication from and along the said wharf into the said river, with sloops, &c., as belonging and appertaining to the said wharf, &c. Yet the defendant, well knowing the premises, and with intent, &c., put up, or caused to be put up, and kept, continued, &c., a bridge across a portion of the river, particularly described

Per quod.

in the declaration. *By means whereof*, the plaintiff was not only deprived of the use, benefit and enjoyment of

*his wharf, and of all the profits, benefits, gains and advantages which he otherwise would have made by letting the same; but was also thereby hindered and prevented from selling and disposing thereof, and which he otherwise might and would have sold, for divers large sums of money, &c.

The second count, after stating that the plaintiff was the owner of a wharf, &c., and that the defendants erected and continued a certain other bridge, substantially as in the first count, thus sets forth the special damage: "and thereby the defendants have wrongfully and unjustly obstructed the said navigable communication to and from the said wharf, and hindered and prevented the said plaintiff from having and enjoying the same, so that the said plaintiff could not have and enjoy the same, as, during all that time, he otherwise would and of right ought to have done; but was thereby hindered and prevented from so doing, and wholly lost the use of his said last mentioned wharf."

The third count, in addition to the allegations contained in the 1st and 2d, also charges the defendants with having sunk and built, or caused to be sunk and built, in the river and near to the wharf, a certain mole or pier, to which the bridge, &c.; extended, &c.; and with having continued and kept the same, and thereby blocked up the navigable way and communication, so that he could not use and enjoy it, &c.: whereby he, the plaintiff, during all that time, lost and was deprived of the use, benefit and advantage of the wharf, &c.

The fourth count is like the third, except that it charges the defendants with the erection of the sloop lock and the continuance of it, together with the bridge across it to the pier; and the pier itself: whereby the plaintiff's navigable communication, with his wharf, was blocked up, and he was deprived of the use, benefit and advantage of the same.

The fifth count alleges that the plaintiff was seised of a certain other dock or wharf, &c., and by reason thereof, was entitled to a free navigable communication to and *from his wharf, into and along the river, to a dock or wharf, in the city, near to and adjoining the river, called

2d count

*Per quod.*

3d cour*t.*

*Per quod.*

4th count.

*Per quod.*

5th count.

[*155]

ALBANY,    the steamboat dock.  Yet the defendants, well knowing
Feb. 1828.
———    the premises, &c., wrongfully put up or caused to be put
Lansing
v.     up, in and across a certain part of the river, &c., a certain
Smith.    other lock or gate, with a bridge appurtenant thereto, be-
tween the wharf of the plaintiff and the dock called the
steamboat dock, &c., and then and there wrongfully shut
and fastened up the lock and gate for a long space of time,
*Per quod.*    &c.; whereby the plaintiff was and is greatly incommoded,
annoyed and disturbed in the possession, use and occupa-
tion of his wharf, &c.

Gravamen of     The gravamen of all these counts is, that by means of
all the counts.
the bridges, the sloop lock and the pier, the access to the
plaintiff's dock was rendered inconvenient; or, to vessels
with masts, perhaps, impracticable, by reason whereof, the
plaintiff could not use his dock as advantageously as he
otherwise might have done.   That he lost the profits, be-
nefits and gains which he otherwise might have made, by
letting it; and was thereby hindered and prevented from
the selling and disposing of the dock, which he otherwise
might have done for a large sum of money.

The declaration contains no allegation that the plaintiff
himself, or any other person, was ever actually hindered
from approaching to, or departing from his dock, in sloops,
brigs, &c., or that there was ever any negotiation for the
letting or selling of the dock, which failed in consequence
of the erections complained of.  It proceeds, upon the
ground of a depreciation in the value of the plaintiff's
wharf, necessarily resulting from the erection of the bridges
and the pier.

The proof.    The proof is of the same general character.  Dunbar,
Dusenbury and Marvin testify, that the dock has always
been used, principally, if not exclusively, as a lumber
yard; and that, since the erection of the pier, sloop lock
and bridges, its annual value has been reduced one half.
All the witnesses concur in stating that the water at the
plaintiff's wharf is shallow, so that vessels cannot lay along
side of it, load and unload, except in the spring and fall;
[*156]    *and that generally they have to use what is called a stage,
running from the dock to the vessel, for the purpose of

loading.    Marvin states, that when he used the plaintiff's
dock, it was so difficult to get vessels loaded from it, that
he was obliged to carry his lumber as far down the river
as the market in carts, and then put it on board of sloops.

John N. Quackenbush testified, that since the erection
of the pier, all the lumber brought to Albany is piled upon
it.   That vessels with lumber or hay, as they are usually
loaded, cannot pass through the lock, nor can the larger
steamboats.   But there was no evidence that any steam-
boat was ever at the plaintiff's wharf before the erection
of the pier; and several witnesses expressly testified that
they never saw or heard of one there.

The judge non-suited the plaintiff, on the ground that the   Grounds of
injury which he had sustained was merely consequential, the non-suit at
and not direct; and that the defendants were not respon- the circuit.
sible for such an injury, inasmuch as they had not, in
making the erections complained of, transcended the powers
with which they were clothed as commissioners, by the stat-
ute under which they acted.

It must be conceded that there is nothing in the plain-   Plaintiff's in-
tiff's case, so far as he complains of the pier and the sloop jury   common
lock, to distinguish it from that of every other owner of a others.   many
wharf within the basin; and all the proprietors of docks
above the temporary bridges have sustained an equal in-
jury with the plaintiff, in consequence of their erection.
The injury, therefore, for which the plaintiff seeks remun-
eration, is not peculiar to himself.   It has been equally felt
by an hundred others, whose property is similarly situated.
It is apparent, also, that if the action is sustained, it may
be repeated again and again, as long as the pier remains.
One recovery only satisfies the damages which had accrued
previous to the commencement of the suit.

If, then, it be a public nuisance, which may be proceeded
against by indictment, all the considerations of public policy
upon which the rule is founded, that for a common nuis-
ance no private action shall be brought, would seem to ap-
ply to it with peculiar force.

*In Butler v. Kent and others, (19 John. 223,) it was held   [*157]
that a private action could not be sustained by a vender of

ALBANY, lottery tickets against the managers, for so negligently and
Feb. 1828. improperly conducting the drawing of the lottery, as to
Lansing destroy public confidence in its fairness.  The declaration
v. alleged that thereby the demand for, and the price of tickets
Smith. were so diminished, that the plaintiff was unable to sell those

Cases distin- which he held; that they remained on his hands, and were
guishing what
shall be spe- drawn blanks; so that he lost the money which he paid for
cial   damage them, and the profits which would have been derived from
giving  a pri-
vate action for the sale of them.  *Spencer*, Ch. J., who delivered the opin-
a public nui- ion of the court, puts the decision mainly upon the analogy
sance.
*Butler* v. *Kent*, between that case and the cases of public nuisances.  He
19 John. 223. cites that whole class of cases, and emphasises the principle,
that a man cannot have a particular action without a par-
ticular injury or a particular right; and, in applying it to
the case before him, remarks that the defendants have un-
dertaken a duty which is common, in regard to all those
who purchase tickets in that lottery; that they owe no
peculiar duty, and are under no particular obligation to the
plaintiff as to their conduct, other than such as is common
to all the purchasers and holders of tickets in that lottery;
and that they stand in the same relation to the plaintiff
as they do to a great number of other persons.  The chief
justice says he does not perceive in the allegation of the
plaintiff, that, in consequence of the improper conduct of the
defendants as managers, he was unable to sell his tickets,
any charge of a particular injury to the plaintiff, or that
any particular right of his had been violated.  The injury,
he says, if any, was common to all those who held tickets
in that particular lottery; and we see that, in such a case,
it appertains to the public only to avenge the injury.

This case undoubtedly decides, that the special injury
resulting from a public nuisance or offence, which will sus-
tain a private action, must be peculiar to the plaintiff, and
not common to him and many others; and if it operates
[*158]        *equally, or in the same manner, upon many individuals
constituting a particular class, though a very small portion
of the community, it is not a special damage to each within
the meaning of the rule.

The plaintiff admits that such was the decision in that

case; but he contends that it was erroneous. It becomes proper, therefore, to examine the English authorites which have been cited by the counsel.

Lord *Coke*, in his First Institute, (56, a.) lays down the general rule, "That if a man be disturbed to go over a common highway, or if a ditch be made across it, so that he cannot go, yet he shall not have an action upon his case; and this the law provided, for avoiding multiplicity of suits; for if any one man might have an action, all men might have the like, unless any man hath a particular damage; as if he and his horse fall into the ditch, whereby he received hurt and loss; there, for this special damage, which is not common to others, he shall have an action upon his case." It is to be remarked, that the instance of particular damage, here put by lord *Coke*, is of a direct and personal character, affecting the plaintiff exclusively.

Co. Lit. 56, a

In *Williams'* case, (5 Coke, 72,) an action on the case was brought by Williams against Henry Jones, vicar of Alderbury, for not celebrating divine service, and administering the sacrament, at a particular chapel within the manor of the plaintiff. The defendant was found guilty; and upon a motion in arrest of judgment, it was held by the whole court that the action would not lie; because the chapel was not private to the plaintiff and his family, but public and common to all his tenants of the same manor, which may be many; and if the lord could maintain an action, so could each of his tenants; and so there would be many actions for one default. But if the chapel had been private to the lord and his family, then he might have maintained the action.

*Williams'* case, (5 Rep. 73)

In this case, the exception to the rule, that for a common nuisance a private action will not lie, is thus stated: *"But if any particular person afterwards, by the nuisance done, has more particular damage than any other, there, for that particular injury, he shall have a particular action on the case." The principal case, and the illustration recognise the principle, that the particular damage must be in some respects peculiar and personal to the party bringing the action. That it is not enough that he should

[*159]

ALBANY,    suffer more than the community generally, if he only
Feb. 1828.  suffer in common with a distinct class.(a)  It is true that
Lansing    in this case it was held, that the lord and his tenants had
v.
Smith.     a remedy in the spiritual court; but that does not vary
           the case.  The remedy here is by indictment.

Robert Ma-    In *Robert Mary's case*, (9 Coke, 112,) it was held that one
ry's case, 9  commoner might have an action on the case for the destruc-
Rep. 111.
           tion of the herbage of a common, if it was so fed that
           the commoner had not sufficient pasture for his cat-
           tle, &c.  But if the injury is small, so that enough is left
           for the commoner, he shall have no action, though the lord
           of the soil may; because, the trespass is not the ground of
           the commoner's action, but the consequences of that tres-
           pass, *per quod proficuum communiœ suœ amisit.*  And to the
           objection which was made, that if one commoner had
           an action, then every other commoner might sue for
           the same cause, and actions would be multiplied, it was
           answered by the court, 1. That it did not judicially ap-
           pear to the court that any other had common there but the
           plaintiff, and therefore the color of multiplication of suits
           as for a nuisance in the highway did not apply; and 2.
           That trespass done to many commoners, is *privatum* and
           not *commune nocumentum.*  It is a private wrong to the in-
           habitants of a particular town, and not a public common nui-
           sance to be redressed by a public prosecution.

Pain v. Pat-   In *Pain* v. *Patrick and others*, (3 Mod. 289,) the action
rick,  3 Mod.  was brought for hindering the plaintiff from going over a
289.
           ferry which the declaration alleged the defendants were
           bound to keep.  The only special damage alleged, was the
[*160]     *loss of the plaintiff's passage; and it was held that the
           action would not lie; that, being a public and common
           ferry for all people to pass, it was like the case of a common
           highway, for obstructing which no one can maintain an ac-
           tion, unless he alleges some particular damage done to him-
           self.  And by way of showing the kind of special damage
Hart v. Basset,  requisite to sustain an action, the court say, if toll had been
T. Jones, 156,  exacted from the plaintiff, then an action on the case had
and  Chichester
v.  Lethbridge,  been the proper remedy, an act peculiarly and exclusively
Willes, 71.   affecting the individual.  The cases of *Hart* v. *Basset*, (T.

(b) *Pierce* v. *Dart*, (7 Cowen, 609,) S. P.

Jones, 156,) and *Chichester* v. *Lethbridge*, (W:les, 71,) were actions on the case for obstructing a public highway. The general doctrine was distinctly admitted in both cases, that the plaintiff must show some special damage peculiar to himself, to entitle him to maintain the action. In the first case, it was alleged that the plaintiff farmed the tithes of a certain parish for a year; and was possessed of a certain barn, in which he intended to lay them; and that the highway, which the defendant had obstructed with a ditch and a gate, was the direct way for carrying the tithes to his barn: and that, by reason of the obstruction, he was forced to carry them round about, and in a more difficult way. This was held sufficient; that the additional labor of the plaintiff's servants and cattle was, a particular damage, which might be of more value than the loss of a horse in the ditch. Ld. Holt, however, in *Iveson* v. *Moore*, (Ld. Ray. 486,) questions this case, so far as it rests on the ground of the plaintiff's being obliged to go farther round with his tithes; but says that the plaintiff was liable to an action, if he did not remove the tithes in a convenient time; and that all this was specially shown, and was perhaps sufficient. But the damage shown in that case, though small, was still peculiar to the plaintiff. His case did not rest on the inconvenience which the obstruction occasioned to him in common with his neighbors or the public; but he showed that he was obliged to remove the tithes. It is analogous to the case of an individual bound under a penalty to transport a given quantity of military stores, or proceed to a given place within a certain *time. If, in consequence of an obstruction in the road which he is obliged to use, he fails in the performance of his contract and incurs the penalty, or to avoid that consequence, is put to additional expense in going a circuitous route, and employing additional teams, he shows a special injury peculiar to himself, not resting in contemplation, but actual, which would probably entitle him to an action. The case of *Chichester* v. *Lethbridge* was decided upon the authority of *Hart* v. *Basset*. It was for obstructing a public highway, so that the plaintiff could not pass with his coach. The declaration expressly

ALBANY,
Feb. 1828.

Lansing
v.
Smith.

[*161]

ALBANY,
Feb. 1828.
———————
Lansing
v.
Smith.

alleges that the plaintiff attempted to travel the road with his coach several times; but could not, &c.; and that he attempted to remove the obstruction, and was prevented by the defendant. The action might have been sustained on the latter ground alone. The plaintiff had a right to remove the obstruction; and the direct and personal interference of the defendant to prevent him, was a wrong to him individually. Every man has a right to clear the public highway of unlawful obstructions; and he who prevents such removal, subjects himself to an action. But on the first ground, his case was distinguished from that of the public, in having actually attempted to pass and been prevented.

*Morley* v.
*Pragnell,* Cro.
Car. 510.

*Morley* v. *Pragnell,* (Crok. Ch. 510,) was the case of a private nuisance, a tallow furnace, which annoyed the plaintiff's guests, (he being the proprietor of a common inn,) and caused them to leave his house, and rendered his family unhealthful. Upon a motion in arrest of judgment, after verdict for the plaintiff, the only point made was, that the defendant had a right to use his trade, and it could not be said to be a nuisance. That the special damage was sufficiently laid and proved, was not disputed.

*Fineux* v. *Ho-
venden,*   Cro.
El. 664.

*Fineux* v. *Hovenden,* (Cro. El. 664,) was an action for obstructing a way leading from one part to another of the city of Canterbury, which all the inhabitants had a right, and had been accustomed to use; whereby the plaintiff lost his passage; and, upon a motion in arrest of judgment,

[*162]

it was held that the action would not lie; that no *special damage was shown; and that the obstruction was a nui-

*Westbury* v.
*Powel,*  cited
Cro. El. 664.

sance which was punishable criminally. The case of *Westbury* v. *Powel* is there cited, in which the plaintiff, being an inhabitant of Southwark, brought an action on the case against the defendant for obstructing a common watering place belonging to the inhabitants of Southwark. The action was sustained on the express ground that there was no other remedy; that the defendant could not be proceeded against criminally; and if the inhabitants individually could not obtain their actions, the nuisance could not be abated. If the premises were correct, there can be no doubt of the conclusion. If the public cannot avenge or

restrain the nuisance, every citizen, from the necessity of the case, must be permitted to recover compensation for his individual share of the general injury.

ALBANY,
Feb. 1823.

Lansing
v.
Smith.

Iveson v.
Moore, Lord
Ray. 486.

*Iveson* v. *Moore*, reported in Lord Ray. 486, 12 Mod. 263, and several other books, is that upon which the plaintiff seems principally to rely. The plaintiff in that case declared that he was possessed, for a term of years, of a certain colliery in Dale, near the highway leading from A. to B. through which his customers used to come and go, to take and carry away the coals dug out of his colliery. That on a certain day he had 200 loads of coal there dug, ready for sale; and that the defendant, intending to deprive the plaintiff of the benefit of his colliery, and to seduce the plaintiff's customers from his colliery to a colliery of the defendant adjacent thereto, &c., laid six cart loads of stone and an ash tree athwart the said highway at Dale, within the two bounds aforesaid, and continued them there for two months, &c., so that the plaintiff's carts and carriages for carrying the coals could not pass, &c., *per quod* the plaintiff, *per totum tempus predictum, totaliter perdidit* the benefit and profit of his colliery; and his coals dug out of his said colliery, *magnopere depreciati et deteriorari devenerunt pro defectu emptorum ex causa predicta sic impeditorum.* Upon not guilty, a verdict was found for the plaintiff, and the motion before the court was in arrest of judgment. Gould and Turton, justices, thought *the declaration good, especially after verdict; but Lord Ch. J. Holt and Mr. Justice Rokeby thought the special damage stated in the declaration, was not sufficient to sustain the action. The court of king's bench being thus equally divided, the cause was argued before the justices of the common pleas and the barons of the exchequer, at Sergeant's inn, who all agreed in the opinions of Turton and Gould, Js., that the action lay.

*[163]

The principal ground of difference between the judges in the king's bench, was as to the necessity of the plaintiff's showing in his declaration who the customers were, who were prevented by the obstruction complained of from coming to his colliery to purchase his coals. They all

ALBANY,
Feb. 1828.

Lansing
v.
Smith.

agreed in the principle, that the action could not be main-tained unless the plaintiff showed a damage, as Mr. Justice Gould expressed it, more peculiar to himself than any other of the king's subjects. Lord Holt held, that as the special damage was the gist of the action, without which it would not lie, such particular damage ought to be laid in a special manner; and he held the distinction to be this: That dam-ages in the *per quod* need not be shown with certainty, where the action is maintainable without the *per quod*; but if the *per quod* is the ground of the action, the damages ought to be particularly stated. But Gould and Turton, justices, contended that there was no such distinction; and that the damages need not be stated with any more particu-larity, where the action was brought for obstructing a pub-lic way, than though the obstruction had been in a private way. None of the judges denied, that if it had appeared from the declaration that the plaintiff lost the opportunity of selling his coal, because purchasers were prevented from approaching his colliery by the obstruction complained of, and that it deteriorated upon his hands, that that was a special damage peculiar to the plaintiff, for which he could maintain an action; and they differed only as to the ques-tion, whether, in judgment of law, those facts did appear upon the declaration.

Durnford's
note on *Iveson*
[*164]
v. *Moore*, Wil-
les, 74.

It is stated by Mr. Durnford, the editor of Willes Re-ports, in a note to *Chichester* v. *Lethbridge*, (Willes, 74,) *that the reason assigned by the judges in the exchequer chamber, for sustaining the action in *Iveson* v. *Moore*, was principally this; that it sufficiently appeared that the plaintiff must and did suffer a special damage, more than the rest of the king's subjects, because it was set forth that the only way to come to his coal pits from one part of the county, was through the way which the defendant had obstructed; by which it must be understood, without any allegation of the loss of customers, that the plaintiff did suffer particularly in re-spect to his trade by the plaintiff's wrong. I cannot but doubt the accuracy of this report. If such was in truth the reason assigned by the judges, and if it be sound, then every country tradesman or merchant can maintain an action for

ALBANY,
Feb. 1828.

Lansing
v.
Smith.

the obstructing of any one road leading from the surrounding country to his shop or store, without alleging that he lost a single customer, by means of such obstruction. The court are to intend, that he sustained a special damage beyond the rest of the community, because one way by which his establishment might be approached was rendered impassible.

But suppose the way thus obstructed, instead of leading to a solitary country store, was one of the avenues to a flourishing country town, containing a hundred retail stores; could the owner of each maintain an action? Even with the allegation of a loss of customers, much more without it? I answer no; because no one would have suffered an injury peculiar to himself. It would have been common to him and many others; and that is the plaintiff's case.

*Hubert* v. *Groves*, (1 Esp. N. P. Cas. 148,) was an action on the case, tried before Lord Kenyon, in 1794. The declaration stated that the plaintiff was a coal and timber merchant; and had a right, and had been accustomed to use a certain highway for the purpose of carrying all things appertaining to his business. That the defendant had deprived him of the use and benefit of that way, by putting upon it large quantities of rubbish and earth, by which it was totally obstructed, and the plaintiff prevented from enjoying his premises, and carrying on his trade, in so advantageous *a manner as he had a right to do; and by which the plaintiff was obliged to carry his coal, timber, &c., by a circuitous and inconvenient way. The evidence showed it to be a public highway, and fully supported the declaration; and it was contended by Erskine, that the injury to the plaintiff was of such a particular and special character as entitled him to his remedy by action; but Lord Kenyon thought otherwise; and non-suited the plaintiff. At the next term, a new trial was moved for, and the cases of *Hart* v. *Basset* and *Iveson* v. *Moore*, were cited in support of the motion. But the court of King's bench concurred in the opinion expressed at *nisi prius*, and refused to set aside the non-suit. The court must have considered the case of *Hart* v. *Basset*, as decided on the ground upon which

*Hubert* v *Groves*, 1 Esp. Rep. 148.

*165]

ALBANY, Feb. 1828.

Lansing v. Smith.

Lord Holt, in *Iveson* v. *Moore*, thought it might be sus-tained; that the plaintiff was under a special necessity of removing the tithes, or he would be liable to an action; and that rendered his damage personal and peculiar to him-self. Upon any other ground, the cases are not distinguish-able.

*Rose* v. *Miles*, 4 M. & S. 101.

In *Rose* v. *Miles*, (4 Maul. & Selw. 101,) the plaintiff de-clared that he was the owner of certain boats and barges laden with goods, wares and merchandize; and was navi-gating the same, so laden, along a certain navigable creek, part of a certain public river; when the defendants, with intent to injure the plaintiff, moved and fastened a certain barge across said public navigable creek, and the channel thereof; and thereby obstructed the same, and prevented the plaintiff from navigating his said barges so laden, &c., along the said creek. By reason whereof, the plaintiff was not only obliged to convey all his said goods, &c., a great distance over land; but was also put to great trouble and inconvenience in carrying on his business, and hath been obliged to expend £500 in and about the carriage of his goods, &c., overland as aforesaid. The plaintiff reco-vered in the common pleas where the action was origi-nally brought, and the judgment was unanimously affirmed in the king's bench. The plaintiff here clearly *showed a special injury peculiar to himself. As was observed by Lord Ellenborough, he had commenced his course upon the river, and was in the act of using it when he was ob-structed. It did not rest merely in contemplation; and it was substantially more injurious to the plaintiff than to the public at large, who might only have it in contemplation to use it. He was actually impeded in his voyage, (not deterred from commencing it,) and compelled to unload and carry his goods over land; and Lord Ellenborough concluded by saying, that if a man's time or his money are of any value, the plaintiff had shown a particular damage.(a)

[*166]

*Greasly* v. *Codling*, 2 Bing. 263.

*Greasly* v. *Codling and another*, (2 Bingham, 263,) is the latest English case in which this question has been consi-

(a) *Pierce* v. *Dart*, 7 Cowen, 609, S. P.

dered. The plaintiff declared against the defendant in case, for shutting and keeping shut a gate across a public highway; and thereby compelling the plaintiff, who was driving three laden asses, to go back and perform his journey by a very circuitous route. I should infer from some facts of the case, that it was a private way, for it is stated that the object of the action was to establish a right of way, and that the plaintiff proved the right and the disturbance of it, as alleged in the declaration. However, the case, in the opinion of the court, is treated as that of a public highway. The plaintiff was a coal higgler, and was actually traveling the road with three laden asses, when the defendant shut a gate across the road, and detained him some hours, and compelled him to go round by a circuitous route, by which he could not go so often in a day, as by the direct route. The court of common pleas held, upon the authority of *Rose* v. *Miles*, that here was an injury shown, personal or peculiar to the plaintiff; whether to a greater or less extent, was a question for the jury. It is the precise case put by Lord Holt, by way of illustration, in *Iveson* v. *Moore*. The stopping of any man, is a particular damage to him; but the stopping of a way is a common damage to all.

*The case of *Hughes* v. *Heiser*, (1 Binney, 463,) is essentially like that of *Rose* v. *Miles*. It was an action on the case, to recover damages from the defendant for obstructing the Big Schuylkill, a public stream, by the erection of a dam so constructed that the plaintiff's raft could not pass over it. The declaration stated that the plaintiff had provided for himself 50,000 feet of pine boards, and a large quantity of timber, and had it made into three rafts above the dam, with intent to raft them down the river below the dam; that he did navigate as far as the dam; and that they were entirely prevented by the dam from passing down the river. That the dam was not constructed with a proper slope as required by the act authorizing its erection. The only distinction between this case and that of *Rose* v. *Miles*, is, that here the plaintiff did not transport his raft around the dam by land, and thereby incur an

[*167]

*Hughes* v. *Heiser*, (1 Bin. 463.)

additional expense. But from the very nature of the raft, it could go to market only by water; and being stopped upon the river, the voyage was lost; and the plaintiff must inevitably have sustained a special injury. His damage was palpable and peculiar to himself.

But could Hughes have recovered, if his declaration had merely stated that he owned a valuable lot of timber above the dam, which he had intended to raft to market; but did not, in consequence of the erection of the dam, whereby he lost the profit which he should otherwise have realized? His damage then would have rested in contemplation; and would have been common to himself and many others. Or suppose the consequential injury complained of had been the depreciation of the value of his lot or his timber, whereby he was prevented from selling either the one or the other for as large a price as he could have obtained before the navigation of the river was impeded by the dam: he would, I apprehend, have been told that there was nothing peculiar in his case; that if his land and timber were rendered less valuable by the obstruction placed in the highway leading to a market, so were the land and the timber of his neighbors, and of all others above the dam; that the erection of the dam was a *public offence; and the defendant could be punished criminally for building it, and the dam itself be demolished by a public prosecution, and that public policy forbade that a multitude of suits should be brought for an act which essentially concerned the public, although, in its remote effects, it might bear peculiarly upon a particular district.

This seems to me to be precisely the plaintiff's case. His damage consists in the depreciation of the value of his dock. He cannot rent it for more than half what it once produced him. This is the sole injury which he has proved himself to have sustained.

Suppose the basin should render the streets contiguous to it, in its whole extent, unhealthy, so that the houses could not be rented at all, or at very reduced rates; could every landlord maintain an action against the defendant for the

tion of his rent? That will hardly be contended; and yet, in principle, the cases are the same.

We are of opinion that the motion to set aside the non-suit should be denied.

Motion denied.