## SAMUEL BAILEY vs. THE PHILADELPHIA, WILMINGTON AND BALTIMORE RAILROAD COMPANY.

The State has the right of a proprietor over navigable streams entirely within its borders; and may obstruct, or (unless where restricted by the Constitution of the United States,) may close up, such streams at pleasure.

Such rivers are public highways, and open to all for navigation and fishery; but the legislature may impair or take away these public rights for public purposes.

The riparian proprietors have no individual rights to the river; and are entitled to no compensation for the loss of those which they hold in common with other citizens.

An obstruction of the river, authorized by the legislature, gives no right of action.

An unauthorized obstruction is punished by indictment, and not by private suit.

The act of assembly of 1837, (9th vol. 59,) authorizing the railroad company to erect a close bridge over White Clay creek, is constitutional; and gives no right of action to the owner of a mill above, though damage results to him from the loss of navigation, and obstructing the flowage of water.

But such bridge must be made, and kept up, in conformity with the law. Any additional obstruction is unauthorized; and, if attended with special damage, actionable.

An act giving a right of action for *authorized* obstructions passed after they were made, and not accepted by the railroad company, is a violation of their charter, and of the obligations of the contract with them; and, therefore, unconstitutional.

An act giving a remedy by summary action for *unauthorized* obstructions is constitutional, though passed after the injury sustained.

The assessment of damages by a jury of inquest, returnable to court, is a constitutional mode of trial in such cases.

The Supreme Courts of a State, are obliged to decide on the constitutionality of laws; and, in cases of plain and apparent opposition, to pronounce them void.

QUESTIONS of law reserved by the Superior Court. Heard at June term, 1846, before Judges Harrington, Milligan and Hazzard, and John W. Houston, judge ad litem, in the place of the Chancellor, he and the Chief Justice being legally disqualified to sit.

The defendants were a joint stock company, incorporated in 1832, (8 vol. 107,) as the Wilmington and Susquehanna Railroad Company, with power " to locate and make a railroad across this State from

the Pennsylvania to the Maryland line, between Philadelphia and Baltimore via Wilmington, having due regard to the situation or nature of the ground and of the buildings thereon, the public convenience and interest of the stockholders, and so as to do the least damage to private property," (*sec.* 12.) The said company was authorized (*sec.* 13,) to enter upon any land which they should deem necessary for laying out of said road; and also for the purpose of searching for stone, sand, gravel or wood, for constructing the same. By section 15, it was enacted that " whenever it shall be necessary for the said company to enter in and upon, and occupy for the purpose of making said railroad, any lands upon which the same may be located, if the owner or owners of said land shall refuse to permit such entry and occupation, and the parties cannot agree upon the compensation to be made for any injury or supposed injury, that may be done to said land by such entry or occupation," such damage should be estimated by five disinterested men, to be agreed on by the parties, or appointed by the Superior Court; and on their report being confirmed and the company paying the sum awarded " in full compensation for said lands, or for the injury sustained as aforesaid, the said company shall become seized of the same estate in the said lands which the owner held in the same, and they and all who act under them shall be acquitted and freed from all responsibility for or on account of such damage : provided, that payment of damages for lands through which the said road may be made, shall be made before said company, or any person in their employ shall be authorized to break ground, &c.    Section 16, provided " that if in the location of said railroad it shall be found necessary to pass over any navigable river or creek by a bridge or other edifice, it shall be the duty of said company to construct and keep in repair, a sufficient pass or draw in said bridge or edifice, over the channel or deepest part of said river or creek, for the purpose of letting vessels pass and repass through the same; which draw shall at all times, on the approach of any masted vessel or vessels, be drawn at the cost of said railroad company," &c. &c.

By a supplement to this act, passed in 1835, (9th vol. 9,) this company was united with the Delaware and Maryland Railroad Company ; and was authorized, whenever it was necessary for them to enter into and upon, and occupy for the purpose of making the railroad, any lands or tenements, they should signify it to five commissioners named by this act, who should thereupon " estimate the damage that may be done to said lands and tenements, by such entry

and occupation ;" on payment of which, the title to the land should become vested in the company. But the owner of the land, if dis- satisfied with their report, was authorized to sue out a writ of ad quod damnum, to inquire by a jury of twelve men " what damages will be sustained by such owner by reason of said railroad, so pass- ing through any lands or tenements belonging to him, her or them, taking into consideration all the advantages to be derived to him, her or them, by reason of said railroad."

Another supplement, passed in 1837 (9th vol. 59,) united the com- pany with the " Philadelphia, Wilmington and Baltimore Railroad Company," and authorized it to convert the drawbridge erected by it over the White Clay creek into a permanent bridge, " and to keep the draw closed, or dispense with it altogether : provided, that if by accident or otherwise, the bridge should be broken down or destroy- ed, the company should erect " another bridge over the said creek, at the same place, and of the same height and dimensions, and of the same width between the piers, as those of the present bridge."

By another supplement passed in 1839 (9th vol. 243,) the defend- ants were authorized to keep a permanent bridge, without a draw, over Boat or Bout creek, at the place where such a bridge was then erected, any thing in the previous laws notwithstanding : *provided,* that the owners of the land lying on said stream, should have the right within six months, to sue out a writ in the nature of a writ of ad quod damnum, to inquire by a jury of twelve men, " whether any and what damages have been sustained by such owner or owners, by reason of the said bridge, erected by the said company, over the said stream, being constructed without any draw or pass therein ;" and to prosecute such proceeding to judgment and execution ; and, *provided further,* that the defendants should pay the costs of a cer- tain suit instituted against them in chancery in relation to this bridge.

This act, which was passed at the defendant's solicitation, with all the acts previously passed, were duly *accepted* by the defendants.

A further act was passed in 1845, (10th vol. 19,) as a supplement to the defendants' charter, extending the " benefits and provisions " which the act of 1839, secured to the owners of land on Boat or Bout creek, " to the owner or owners of any land lying and being on White Clay creek, or on Red Clay creek, as well to recover damages for any injury heretofore sustained, as for injuries that may be hereafter sustained by any of the said owner or owners, in con- sequence of any act, work, or obstruction, of the Philadelphia, Wil- mington and Baltimore Railroad Company, heretofore done or con-

structed, or that may hereafter be made or done: provided, that proceedings for the recovery of damages for injuries heretofore sustained, shall be commenced within twelve months from the passing this act; and within twelve months from the time any injury may hereafter be sustained."

The present proceeding was taken under this last act, which was never accepted by the railroad company.

The plaintiff, Samuel Bailey, was the owner of a mill-seat and mills, on the White Clay creek, above the defendants' bridge. This bridge, with its embankments, &c., were made by the defendants in the years 1835-6; the bridge having then a draw, as required by the original act of incorporation. It was made a permanent bridge, (without a draw,) in the spring of 1837, as authorized by the act of 1837. One of the piers of the bridge was partially prostrated by a flood in January, 1839, and a new pier erected by the side of the old one, occupying about four feet more of the stream of said creek, and diminishing the pass way of the water to that extent. The piers and abutments were placed transversely across the stream; and one corner of each abutment stands in the stream below high water mark; and these, with the piers and embankments, were the obstructions complained of. There was no culvert through the embankments.

The White Clay creek, is a stream lying within the State of Delaware, having its sources in Pennsylvania; navigable to vessels with masts, up to plaintiff's mills before the erection of this bridge, and the tide ebbs and flows up to, and above the bridge, but only within the State of Delaware.

The plaintiff, availing himself of the act of 1845, sued out a writ in the nature of a writ of ad quod damnum, to ascertain whether any, and what damages had been sustained by him, by the erection of the bridge aforesaid, or any other act or obstruction of the defendants.

It was admitted that all the acts, works, and obstructions complained of, were done and made by defendants prior to June, 1839, and a large amount of the damages assessed had accrued therefrom prior to 1840. Also, that the railroad, embankments, bridge, and other works, were not located upon, over, or across the plaintiff's premises; nor has any portion of his land been taken or occupied by the defendants in the making the road, bridge, or other works.

On the execution of the writ, the defendants declined appearing before the jury, and the sheriff returned an inquisition taken on the 5th and 6th of May, 1845, finding damages for the plaintiff to the

amount of $3,888. Whereupon, on motion of *Mr. Wales,* and exceptions filed, a rule was granted to show cause why the writ and inquisition should not be set aside; and the questions of law arising under this rule were afterwards, by consent, reserved for hearing in banc.

The exceptions relied on, were: 1st. That the act of 1845, by virtue of which the writ issued is unconstitutional and void; being a violation of the vested rights of the said company, and of the Constitution of the United States, and also of this State. That the said act has not been accepted by the defendants, and is partial and unjust in its provisions. 2d. Because neither the bridge, railroad, or embankments referred to, were erected or made on the lands or property of the plaintiff. 3d. Because the defendants were not present or heard before the jury of inquest; and, believing the said act of assembly unconstitutional and void, filed a protest in writing before the said inquest against the said proceedings.

The cause was argued in the Court of Appeals, by *Layton* for plaintiff; and *Wales* and *Frame,* for defendants.

On the constitutional question, *Mr. Layton* cited, *Const. Art.* 6, *sec.* 1; 1 *Blac. Com.* 160; 12 *Serg. & Rawle* 331, 344; 1 *Ired. Dig.* 140; 4 *Dev. Rep.* 1; 6 *Cranch* 87, 136; 3 *Dall.* 386, 395; 2 *Pet. Rep.* 522; 12 *Wheat.* 270, 370; 1 *Cow.* 550; 4 *Dall.* 14; 1 *Cranch* 137; 1 *Binn.* 415; 13 *Pick.* 60; 7 *Ibid* 466; 2 *Dall.* 309; 1 *Marsh* 290; 11 *Mass. Rep.* 396; 2 *Harr.* 514; 3 *Marsh* 423; 8 *Pick.* 96; 6 *Conn. Rep.* 495; 3 *Story Com.* 250-1, 245-7-9, 266; 12 *Wheat.* 257, 358; 4 *Ibid* 235, 197, 629, 370; 1 *Hill Rep.* 324; 11 *Pet. Rep.* 420; 8 *Ibid* 110; 2 *Ibid* 414; 3 *Dall.* 391; 15 *Serg. & Rawle* 72; 8 *Wheat.* 89; 4 *Ibid.* 200; 12 *Ibid* 370, 262; 4 *Ibid* 425; 1 *Cranch* 109; 9 *Ibid* 374; 4 *Ibid* 384; 1 *Baldw.* 74; 21 *Pick.* 250; 16 *Mass. Rep.* 273; 1 *Paige Ch. Rep.* 107; 2 *Hill* 31, 45; 13 *Wend.* 325; 25 *Ibid* 680; 4 *Hill* 384; 23 *Wend.* 103; 8 *Cow.* 146.

*Frame* and *Wales,* contra., cited, 2 *Harr. Rep.* 76, 514, 553; 3 *Ibid* 294, 335, 441; 1 *Del. Laws Appx.* 70, 79, 80; 8 *Ibid* 3; *Const. Art.* 1, § 9; 1 *Blac. Com.* 44; *Mag. Chart. Ch.* 29; 2 *Co. Inst.* 50; 6 *Cranch* 135; 9 *Ibid* 52, 535; 2 *Dall. Rep.* 307; 3 *Ibid* 387; 3 *Story Const.* 268; 2 *Pet. Rep.* 414, 419, 657; 13 *Wend.* 328; 1 *Paige Rep.* 107; 11 *Mass. Rep.* 404; 4 *Hill* 140; 5 *Pick.* 69; 4 *Wheat.* 235; 4 *Hill* 76, 92; 2 *Pet. Rep.* 245; 8 *Cow.* 146, 246; 9 *Conn. Rep.* 436.

Judge Harrington, delivered the opinion of the court.

HARRINGTON, *Justice.*—The case before us, so much elaborated in

argument, as it well deserved to be on account of the grave questions involved; may be compressed within narrower limits, when the true questions at issue are fairly presented to the mind. Indeed, the argument itself has, by mutual concession, excluded many topics which it will be unnecessary for me particularly to notice in expressing the opinion of the court on the whole matter.

The plaintiff's proceeding is to recover damages alledged to have been sustained by him from the act of the defendants. His writ of ad quod damnum directs the jury to inquire whether any, and what, damages have been sustained by him in consequence of the act, work, and obstruction of the defendants, in the construction of a certain bridge and causeway across White Clay creek. He is the owner of a mill-seat and mills on that creek, above this bridge, and has suffered damage, as the proceeding assumes, as the indirect and consequential result of its erection; either from the obstruction in the navigation, impeding the flow of water, or otherwise, which he is entitled to ascertain and recover, by writ and inquisition. Objections have been urged to this *form* of proceeding; and even to the regularity of the writ and inquest; but I wish first to settle the *right of action*, before I examine the mode of remedy, or form of process.

The defendants are an incorporated company, authorized by legislative grant to make a railroad across the State in a certain direction; with power, at first general, and afterwards specific, to make a bridge across the White Clay creek. They were required to locate the road with due regard to public convenience, and so as to do the least damage to private property; and to compensate any person through whose land the road might be located, the damages which he might sustain from their entry upon and use, and indeed their appropriation of his land; for, by the charter, the *title* to the land so occupied is vested in the company on payment of damages. They were authorized to make bridges over such streams of water as it might be necessary for them to cross, being required in respect to *navigable* rivers or creeks to furnish a sufficient draw or passway for vessels, with only two exceptions, one of which was the White Clay creek, and the other, a stream called Boat or Bout creek, in Brandywine hundred. In regard to White Clay creek, the authority to make a close brige was expressly given by act of Jan. 13th, 1837, with the sole condition, that in case of its destruction they should erect another bridge at the same place, and of the same dimensions. The right to make a close bridge over Boat creek was conferred on the defendants, by the act of the 14th of February, 1839, with a pro-

viso that the owners of land lying on said stream should be entitled to inquire by a jury what damages they sustained by reason of the bridge being made without a draw or passway; which damages the defendants were made liable for; and they accepted the power thus given them, with this condition.

Under these legislative grants, with the restrictions mentioned, the defendants proceeded to locate a railroad; and built a bridge over the White Clay creek with a draw, which they afterwards closed, and made a permanent bridge; under the act of 1837. In the location of the road the defendants entered upon no land of the plaintiff, and appropriated none of his property to their use. Neither the bridge, nor its abutments, approaches or appurtenances, have any connection with the plaintiff's property. The defendants, therefore, claim the *right*, by grant from the State, to make this bridge without any liability whatever to individuals, for any obstruction it may occasion to the creek over which it is built.

The leading question, then, in this cause, is, whether there is any such legal liability on the defendants; and, supposing the plaintiff to have sustained incidental and indirect damage from the obstructions caused by this bridge, whether any right of action accrued to him, as against these defendants, for the erection of this bridge by them under the circumstances stated. If such right of action did not exist originally; the next question will be, whether it was lawfully conferred by the act of the 4th of February, 1845.

The White Clay creek, and all other navigable rivers within the State, belong to the State, not merely in right of eminent domain, but in actual propriety. The State retains the right of eminent domain to even private property, or property granted by it to individuals; which is the ultimate right of the sovereign power to resume the grant for public purposes, on payment of just compensation. (11 *Pet. Rep.* 641, 642; *Vattel B.* 1, *ch.* 20, § 244.) But navigable streams have never been granted to individuals; and the State resumes nothing, and of course violates no one's right of property, when, for great public purposes, it uses the waters of such rivers even so as to impede or deprive individuals of their accustomed use of them. It is true, that in relation to great rivers which afford essential means of commerce with other States and the world, certain restrictions are imposed on the States themselves by the Constitution of the United States; but of such a river as this it may be assumed, at least since the case of *Wilson* vs. *The Blackbird Creek Marsh Company*, (2 *Pet. Rep.* 251,) that the State has the unrestricted right of a

proprietor over its waters; and may obstruct or close the same, if the public interest or convenience requires it to do so. As a public highway, it is free to all citizens for navigation or fishery; but when the legislature deems it more beneficial to the public to close this highway by a permanent bridge, or to exclude the fish from its waters by a dam, it is a question only of public expediency, and furnishes no just ground of complaint from individuals who have heretofore enjoyed benefits and advantages which may be abridged, or cut off, by the improvement. Much less does it give a right of action. Even if such an obstruction were unauthorized; the unlawful act of an individual; no private right of action would accrue for that which is a common wrong, and a nuisance. The remedy would be general, like the injury; by indictment of the wrong-doer, and abatement of the nuisance. And so with regard to private property situated upon such rivers. The owner of such property holds it, subject to this right of the public to use the stream at the will of the legislature; and if, in the use of it, indirect damage arises to such property, it is an inconvenience to which he must submit, unless the State makes compensation as a mere gratuity. It is *damnum absque injuria;* a damage not merely without remedy, but without right to a remedy; a part of the cost of the party's connection with society, to be set off against its general blessings, or compensated by the use of the river still left to him in a restricted form, and to which he has no better right than every other citizen. Either he must submit to this inconvenience, or the public give up their right to use the river in the mode desired. The assumption that such use of it, authorized by the State, gives him a right of action against any one, is founded on the idea that as owner of land adjoining the river, he has a right to the uninterrupted flow of the river in its natural course, which the State cannot interrupt for any purpose, however general or important the object may be. Such a proposition was pronounced in *Lansing* vs. *Smith,* to be " too extravagant to be seriously maintained." " It denies, (as the court there said,) to the State, the power of improving the navigation of the river by dams, or any other erections which must affect the natural flow of the stream, without the consent of all the proprietors of the adjacent shore within the remotest limits which may be affected by the operation."

Nor would the evil of such a principle stop here. If the State cannot use its own property for public purposes without liability for incidental damage, much more must it be liable for such damage in the exercise of its right of eminent domain; so that it would be im-

possible to make a railroad or canal, or authorize any other public improvement, without incurring such an indefinite amount of liability as would effectually put a stop to improvement. Every road, public or private, crossed by such railroad or canal, would afford occasion for numberless suits; every person, however remote, who was deprived of any easement or convenience, however slight, though it was held by the same authority that takes it away, would have his action on the case for damages; and, as this would be a continuing wrong, the liability to renewed suits would, in case of special damage, continue to exist, until the projected improvement was abandoned. Such a principle is indeed, too extravagant to be seriously maintained; while the contrary is vindicated not merely by its reasonableness and necessity, but by the authority of repeated decisions of the courts.

In The Plate Glass Company *vs.* Meredith, and others, (4 *Term Rep.* 794,) the defendants acting as commissioners of pavements, under an act of parliament, so paved the public street as to cut off the usual communication to plaintiffs' warehouse, and the court decided that no action would lie for damages. Lord Kenyon said, " if such an action could be maintained, every turnpike act, paving act, and navigation act, would give rise to an infinity of actions. If the legislature do not empower the commissioners to award satisfaction to individuals who happen to suffer, they are without remedy. The interests of individuals must give way to the accommodation of the public:" and Judge Buller said, "if the thing complained of were lawful at the time, no action can be sustained against the party doing the act."

A public navigable river, prima facie and of common right, belongs to the sovereign power. The lands of individuals bounding such river are held by grants from or under the State, which grants do not divest the State of its power to improve the navigation, &c., and, for such purposes, it may do every thing for the full enjoyment of its rights; only it cannot take private property for public use without compensation. (*Hollister* vs. *The Union Company,* 9 *Conn. Rep.* 436, 446.)

The public, as owners of the river, may improve the navigation without liability for remote and consequential damages to individuals. The injury is one to which individuals must submit as the price of the social compact: it is damnum absque injuria.

Remote and consequential injuries by turnpike roads, improvements of rivers, or streets, &c., will not furnish a cause of action

against those who are authorized by the legislature to accomplish such object, if they act within their powers, with honesty and discretion.

The statute of New York, authorizing the construction of a basin in the Hudson river at Albany, and erections whereby the docks of individuals above were rendered inaccessible, or less easily approached by vessels, and therefore, much depreciated in value; though it provided no compensation for such a consequence, is not unconstitutional, either as taking private property for public use without just compensation, or impairing the obligation of contracts. This not being a direct invasion of private property, but remote and consequential merely, and arising from a public improvement, the injury is one to which individuals must submit as the price of the social compact, and in the eye of the law the injury is damnum absque injuria. (*Lansing* vs. *Smith*, 8 *Cow. Rep.* 146.)

The act of 1832, which incorporated the W. & S. Railroad Company, authorized the defendants to make a drawbridge over any navigable river or creek it should be found necessary to cross in locating the road; and the act of 1837, having special reference to the bridge already built over the White Clay creek, gave them authority to convert that bridge into a permanent bridge, without a draw; provided, that if by accident or otherwise, the said bridge should be broken down or destroyed, it should be their duty to erect another bridge over the said creek at the same place, and of the same height and dimensions, and of the same width between the piers, as those of the bridge then erected. Upon the principles before stated, if the act and obstruction of which the plaintiff complains, be the erection or change of this bridge, within the scope and meaning of the authority thus granted by the legislature, these acts afford no ground of action for damages resulting from such bridge, and the plaintiff is wholly without remedy.

2. Supposing him to be without any right of action previous to the act of 1845, we are next to consider the effect of that act which, according to the plaintiffs' construction, and the use to which in this suit it is applied, gives to him a remedy by writ, in the nature of a writ of ad quod damnum, to recover damages for any injury *heretofore sustained*, or that may be sustained hereafter, in consequence of any act, work or obstruction of the defendants, heretofore done or constructed, or that may be hereafter made, or done. If this be the true construction and meaning of the act of 1845, it will not be denied, that it necessarily raises the question whether the legislature

can essentially vary the terms of a charter of incorporation without the consent of the company; can make an act duly authorized by its charter, and lawful when done, unlawful; and subject it not only to a general action, but to a summary action for damages, under circumstances where neither the charter, nor common law, give any right of action, or claim for damages. I endeavor to state the question correctly. The defendants' charter authorized them to make and to change this bridge, without imposing on them any liability to pay any incidental and consequential damages to the owners of lands lying on the river. The general law of the land imposes no such liability, and denies that the plaintiff can sustain, in a legal sense, any *injury* from such authorized act of the defendants. I assume, at present, that the bridge is made, and afterwards changed in strict compliance with the authority given by the charter; and the plaintiff contends that the act of 1845, makes the defendants liable to an ad quod damnum process, for the recovery of damages sustained by him in consequence of the erection of this bridge. The question then is, as I have stated, whether, after an act of incorporation is duly granted, accepted and acted under, a subsequent legislature can, without the consent of the corporators, essentially change its terms; can make an act lawfully done in pursuance of it, unlawful; and subject the company to actions and damages, where no cause of action existed before. It can hardly be necessary to attempt the argument of such a question; but I will state a few general propositions established by the adjudged cases on this subject.

It was conceded in the argument, that an act of the State legislature which has the effect to impair the obligation of a contract, is unconstitutional and void, under the prohibitions of the Constitution of the United States; and it was further conceded, that the State courts, as well as the courts of the United States, were not only authorized, but bound, to treat such an act as a nullity; because the 6th article of that constitution expressly declares it to be the supreme law, binding on all courts, and judges. While he argued that an act divesting vested rights was not unconstitutional; and further, that this court had no authority to declare any act of the legislature void, merely because it violated the constitution of this State, the counsel for the plaintiff did not deny, but fully admitted, that an act thus violating the Constitution of the *United States,* could not be binding on any one.

An act of incorporation either for public or private purposes is, both in form and substance, a contract. (3 *Story Com.* 258.) "It confers

rights and privileges upon the faith of which it is accepted. It imparts obligations and duties on the part of the corporators which they are not at liberty to disregard; and it implies a contract on the part of the legislature, that the rights and privileges so granted shall be enjoyed." It is laid down by Judge Story as a general principle, that whenever a law is in its own nature a contract, and absolute rights have vested under it, a repeal of that law cannot divest these rights, or annihilate or impair the title so acquired. (*Ibid* 258.) The charter of this company is a contract between the State and the corporators, that if they will risk their money in making a great public improvement through the State, they shall have the franchises, liberties, and privileges, granted by the charter; subject only to the restrictions, and conditions, which it contains. Among other powers granted, was that of entering upon private property, and making it their own, on payment of damages to be ascertained in a specified mode.; the power to make bridges across any rivers or creeks which it might be necessary to cross, provided, that in case of navigable rivers they should make drawbridges; and the express power to make the bridge over White Clay creek a *close* bridge without a draw. The right to make such a bridge is conferred without any condition or obligation to pay damages to any person, other than those whose property might be taken for the use of the company; and the charter was accepted and acted upon by the company, on the faith of a contract implied by the very nature of the grant, that the State should permit them to enjoy the rights and privileges so granted. Whatever may be said, therefore, of the power of the legislature to alter this charter, it cannot be doubted that an act which imposes conditions to the rights so granted, which makes the company liable to damages, where the charter or previous laws imposed no such liability, and which fixes a summary mode of enforcing such claim, and recovering the damages; is an act which not only divests the vested rights of the corporation, but violates the obligations of the contract implied by the charter. A vested right is defined by Judge Duncan, in Eakin *vs*. Raub, " as the power one has to do certain actions, or to possess certain things, according to the laws of the land." Such was the right of the defendants to build this bridge, without any other condition or liability than those imposed by the charter; and which was not only divested by the further imposition of liabilities destructive of the power, but such as violate the contract under which the power was accepted and exercised. I presume no one will doubt that if these liabilities had been imposed by the char-

ter of this company, it would not have been accepted by the defendants. If such a law were made to apply, not only to White Clay creek, and Boat creek, but to all other creeks and streams, (as in justice it ought, if justly applicable to any,) nothing is more certain than that it would defeat the object of every act of incorporation for public improvement which is under any necessity to cross public streams. This would be the strongest proof of the extent of the superadded responsibility of the defendants; but it needs not such a change as that to violate a charter. The manner, or degree, in which this change is effected, says Judge Story, (3 *Story Com.* 250,) can in no respect influence the conclusion. "Any deviation from its terms, by postponing or accelerating the period of performance which it prescribes; *imposing conditions not expressed in the contract;* or dispensing with the performance of those which are a part of the contract, however minute or apparently immaterial in their effect upon it, impair its obligation." (*Green* vs. *Biddle*, 8 *Wheat. Rep.* 197-98; *M'Cullough* vs. *Maryland*, 4 *Wheat.* 316.)

These principles are further illustrated by the following decisions.

An act of the legislature of New Jersey, declaring that certain lands should not hereafter be subject to taxes, is a contract which cannot be rescinded; and a subsequent law repealing such act is unconstitutional. (*New Jersey* vs. *Wilson*, 7 *Cranch* 164.)

Insolvent acts which discharge the debtor from future liability for debts contracted previously, are void. (*Sturges* vs. *Crowningshield*, 4 *Wheat.* 122; *M'Millan* vs. *M'Neill*, 4 *Wheat.* 209.)

An act of the legislature of New Hampshire, altering the charter of Dartmouth College, in a material respect, without the consent of the corporation, is an act impairing the obligation of a contract; and is unconstutional and void. (*Dartmouth College* vs. *Woodward*, 4 *Wheat.* 518.)

Acts of incorporation, when granted on a valuable consideration, assume the nature of contracts; and vested rights under them are no more subject to legislative power than any other vested rights. (11 *Pet. Rep.* 569.) When land is granted, the State can exercise no acts of ownership over it, unless it be taken for public use; and the same rule applies to a grant for a bridge, a turnpike road, or any other public improvement. (*Ibid* 569.)

Rights legally vested in a corporation, cannot be controlled or destroyed by any subsequent statute, unless a power for that purpose be reserved in the act of incorporation. (2 *Mass. Rep.* 143, 146.)

If these principles be well established, and apply to the case before

the court, which, in my judgment they clearly do, it will be unnecessary for me further to inquire, whether the act of 1845, violates the constitution of this State; or to examine at any length into the power of this court to declare an act of assembly void, when it is in direct opposition to that constitution. Yet, I would not let the occasion pass, without repeating what has been over and over again decided by the highest courts and the ablest judges in the United States, almost without exception, that in such a conflict it is not only the right, but the bounden duty, of the courts, to give force to the constitution, and annul the pretended law. The power results from the very structure of the government; and exists for the protection of the people, as well as of the constitution itself. The argument which contradicts it, is drawn from the principles of the common law, and a view of the powers of common law courts, under the British form of government, in reference to the law making power there, which is so transcendental that it has been pronounced omnipotent. Deprive the argument of this basis; namely, the supposed *supremacy* of the legislature over the judicial department, and no just conclusion can be drawn against the judiciary. It assumes that the power which *gives law* must necessarily be superior to that which receives it; and that which may be controlled by the acts of another, must, in its nature, be the *inferior*. I submit that this is mere sophistry when applied to the present matter. The very question is, whether it is *law* that is given; and, whether *in respect of the act under consideration*, the court can be controlled. Both departments derive existence, and all the powers they possess, from the constitution; they are co-ordinate in their several spheres; and the relation of superior or inferior, cannot be ascribed to either. (*Vanhorne's lessee vs. Dorrance*, 2 *Dall.* 304.) The legislature possesses no inherent power of making laws; and no powers but such as are derived from the constitution, subject to its limitations and restrictions; the leading one being, that it shall make no law contrary to the constitution. Beyond this, it no more represents the sovereignty of the people than either of the other branches of government does; and when it assumes to pass an act contrary to the constitution, it is not a legislative act, and cannot have the force of law. (11 *Pet. Rep.* 644.)

The judiciary derives existence and power from the same high source. Its business is to administer justice according to *law;* that is, according to the Constitutions of the Government, and the laws passed by the legislature within the sphere of its authority, and in

conformity to the constitution. None other are laws of the land, having any force or effect, In a case, therefore, of plain, palpable, conflict between the constitution and an act of assembly, the court cannot do otherwise than distinguish between that which is law, and that which is not. And, in doing so, so far from arrogating any right to control the legislature in any of its constitutional powers, it is but asserting that which forms the basis of all our institutions,—the supremacy of the constitution itself, and the entire dependence of every department upon the ultimate sovereignty of the people.

It has been remarked by a learned judge, "that no principle can be better established; none more conducive to personal liberty and security of property; none of which the people of this free country can more justly boast; none which so eminently distinguishes our *American* constitutions over every other country and government, than the doctrine which has prevailed since their formation, in the courts of all these States, from Maine to Georgia; *that the people possess the sovereign right to limit their lawgiver, and that acts contrary to the constitution are not binding as laws.* The concurrence of statesmen, of legislators, and of jurists, uniting in the same construction of the constitution, may insure confidence in that construction." (*Eakin* vs. *Raub,* 12 *Serg. & Rawle* 359 ; *Cole* vs. *Virginia,* 6 *Wheat.* 401.) I shall refer to no other authority on this point, (though they abound in all the books,) than that which is the highest of all authorities on constitutional questions, namely, the late Chief Justice Marshall. "The judicial department of every government, (says he,) is the rightful expositor of its laws, and emphatically of its supreme law. If in a case depending before any court, a legislative act shall conflict with the constitution, it is admitted that the court must exercise its judgment on both, and that the constitution must control the act. The court must determine whether a repugnancy does or does not exist; and, in making this determination, must construe both instruments. That its construction of the one is authority, while its construction of the other is to be disregarded, is a proposition for which this court can perceive no reason." (*Bank of Hamilton* vs. *Dudley,* 2 *Pet. Rep.* 492, 524.)

If, therefore, the act of assembly of 1845, be susceptible of no other interpretation than the one given to it in the argument, and which I have been considering, it is unconstitutional and void. But I now proceed to show that this act is susceptible of a construction which shall make it harmonize with the constitution, and at the same time carry out an important public object which the legislature may

be supposed to have had in view in passing it. This is our duty. We are never to suppose an intended violation of the constitution. At the same time, we are bound to place such a construction on the law as will give it effect, if by possibility it will bear such a construction. The courts have gone very far to effect this object. The case of Eakin *vs.* Raub, so much relied on by the plaintiff, not as authority, but for the reasoning of a dissenting judge, is a striking example of the industrious zeal of a court to harmonize the law with the constitution. In Jones *vs.* Wootten, (1 *Harr. Rep.* 77,) the Superior Court of this State decided that a court would never give a construction to an act of assembly which would render it unconstitutional, if the act be susceptible of any other. I submit that the act of 1845, is perfectly capable of such a construction without doing violence to its provisions; by giving to its terms a strictly legal and technical signification, and confining it to such acts and obstructions of the railroad company as were *unauthorized by its charter,* and illegal in themselves. This will make it a law operating only upon the remedy; and not giving, or designed to give, a right of action where none before existed. We have seen that every damage is not in legal contemplation an injury; that there may be damnum absque injuria; that there may be acts which occasion damage and loss to a party without conferring upon him any legal redress; and this not merely for the want of any adequate remedy, but because he has no right of action, or just claim to any remedy. The remedy is perfectly under the control of the legislature; the right of action is not. (1 *Kent's Com.* 455.) In accordance with this well established distinction, the act of 1845, provides that the plaintiff shall have a remedy by ad quod damnum " as well to recover damages for any *injury* heretofore sustained as for *injuries* that may be hereafter sustained," in consequence of any act, work, or obstruction of this railroad company; that is, for any *unauthorized* act, work, or obstruction, for no other can produce an injury in contemplation of law; and the legislature cannot be supposed to have intended to extend a remedy for injuries which the plaintiff had no right to complain of, and which gave him no right of action. If, therefore, the defendants have done any thing in the construction or maintenance of this bridge that was not authorized by their charter, the remedy attaches, and the act of 1845 has full force and effect.

The views which I have before presented of the rights of these parties under the several acts of assembly, including the act of 1845, were on the assumption that the bridge over the White Clay creek,

was built, and altered, strictly in pursuance of authority conferred on the defendants, by the several legislative grants of 1832, 1835, and 1837. If this be not so, these acts will afford no protection. That it was originally built in conformity with the charter, seems to have been recognized by the legislature itself; for the act of 1837, which authorizes its conversion into a close bridge, requires the defendants, in case it should be broken down, or destroyed, to build another at the same place, and of the same height and dimensions, and of the same width between the piers. The only question then is, whether the bridge, in its altered, or renewed form, is in these respects, similar to the bridge first erected, and existing at the time the act of 1837 was passed; for a bridge of any other height, or dimensions, or at any other place, or of any other width between the piers, being unauthorized, would render the defendants liable for any special damage occasioned by an alteration in its construction. The record shows that this restriction of the act of 1837, has not been attended to. Since January, 1839, the bridge occupies four feet more of the stream of this creek, than is authorized by law ; and varies to that extent, which may be a very material one, from the bridge as it was first built, and as it was up to 1837. Whether this deviation was the cause of the injuries of which the plaintiff complains, or any of them, does not appear to the court. Neither the inquisition, nor the testimony taken on the rule, sufficiently shows the source of damage found by the jury, to enable this court to sustain the return on this ground. Indeed, the inquisition itself states that the jury were directed to inquire of the damages sustained by the plaintiff, by the change of the bridge from a drawbridge to a close bridge; which change was entirely authorized by the act of 1837, and afforded no ground for assessing damages. Even if unauthorized, the obstruction to the navigation would afford no cause of individual action, as the injury would be general to all citizens. The testimony of Mr. Faris, one of the inquisitors, was, that this comprised the heaviest item of the claim; and for which, of course, the largest sum was allowed. But, on the principles before stated, this was an injury for which no damages whatever were recoverable; both because the defendants were authorized to obstruct the navigation; and, if they were not, the right of navigation is a right common to all citizens, and the violation of it a public wrong, to be punished by indictment. Mr. Faris also stated, that a part of the damages assessed, was for injury to flour in the plaintiff's mills, caused by the obstruction of the water ; but the date of this injury

does not appear, or whether it was caused by the bridge in its original, or altered form. If this damage was caused by any obstruction which the additional four feet of pier caused to this stream, we are of opinion, that this was a proper subject for the assessment of damages; and that the plaintiff is entitled to recover it by force of the act of 1845, under the remedy which it affords by writ of ad quod damnum. For such an injury an action on the case would lie, where special damage resulted to any one; and, there being a right of action, it is perfectly competent for the legislature to provide a new remedy for such right. It is not objectionable, either for removing the bar of limitation, or for furnishing a different mode of trial by jury, from that which applies to ordinary suits in court. The same power that may limit actions, may remove the limit according to its views of public expediency. These acts have always been sustained on the ground that they affected the remedy merely, and not the right. A party is barred of his suit, after a limited time, only because the public interest requires such limitation; if the legislature judges otherwise, and extends the time of limitation, or removes it altogether, no wrong is done to the debtor, by reviving the suspended remedy of the creditor. Neither is there anything unconstitutional in the mode of trial. All land which has been condemned for the use of the railroad, under its charter, has been condemned by this means; and the very validity of their title to the railroad, rests on the constitutionality of this mode of assessing damages. I know these laws have been questioned; but it seems now to be settled, that the legislature, in the assertion of its right of eminent domain, may not only take private property for public use, but prescribe the mode of assessing damages, even without trial by jury. (*Buonaparte* vs. *Camden and Amboy R. R. Company*, 1 *Bald. C. C. Rep.* 219) But, in truth, this is a trial by jury, such as was known and used in the administration of justice in this State, on various occasions where the legislature conferred a special remedy, even before the present constitution, the requisition of which, is simply, that "trial by jury, shall be as heretofore." (*Art.* 1, *sec.* 4.)

Neither do we think the act is open to any constitutional objection, on the ground taken in argument, that it is a partial, if not a personal remedy given to this plaintiff, and certain other citizens, to the exclusion of all others; and against these defendants only. The remedy is given to all who are liable to the mischief; and against those only, who can do the injury. It is a remedy given to any and every one who is an owner of land lying on the White Clay creek, or Red Clay creek,

for injuries done to such land, by the unlawful acts of the company. It must, of course, be construed in reference to the subject matter of its provisions; and will not, by any means, bear the construction put on it by the defendants' counsel, as extending to personal injuries to travellers, the loss of baggage, or injury to cattle. The law means to protect the owners of land lying on these creeks, from the consequences of any unauthorized obstruction of the creeks, and damage thereby done to the land, or other property there being. It was wholly unnecessary, and would have been idle, to extend it to any others; for no others could by possibility be injured in the way complained of, and by the obstructions intended to be prohibited. It was the solitary case in which the legislature had authorized this company to make a close bride over a navigable stream, without providing compensation for injury to owners of land on the stream. This was done, and it was not now in the power of the legislature, perhaps it would not have been expedient if it had been, to provide such remedy. But it was eminently proper, that ample protection should be afforded against any further obstructions that were not authorized, or lawful. The company had all they needed for the use of their railroad; the right to build a close bridge; to close the navigation of this stream against vessels with masts; and, to a certain extent, to obstruct the flow of water, and turn it back on the owners of land above. All this, these land owners had to submit to, without remedy; but the legislature expressly prohibited this company from any further obstruction; and gave to all who should be injured thereby, a summary remedy to recover damages. It would have been as idle to extend a remedy for injuries to land, to any other than the owner of the land, as it would have been, to make it operate upon any other railroad company, than these defendants, when no other company could produce the injury in the way complained of. This kind of legislation is frequent in practice: the instances of such partial laws, if these be partial, are numerous in our statutes. Almost every act of incorporation has some special law protecting the object of the corporation, and why should not individuals, liable to injury from it, be specially protected? Ditch companies are incorporated, and their ditches guarded by special laws, with special prohibitions, penalties, and remedies; towns are incorporated, and all persons, as well strangers, as those who dwell there, are put under special restrictions, having reference to the place, and are made liable to special penalties, and remedies. The defendants themselves, by the 20th section of their charter, have a remedy for injuries to their road,

or to any " work, edifice, or device," which they may erect, that no individual, and no other company possesses; namely, the right to recover three times the amount of actual damage sustained. They have surely no right to complain, if others are specially protected against their unlawful acts; and are empowered to recover single damages for injuries done by them. In all these instances, the remedy is necessarily confined to those who are liable to the injury; and to pronounce this act unconstitutional, on this ground, would be to declare against the validity of a very numerous class of statutes, never before questioned. If there exists any doubt on this subject, or in regard to the mode of trial, it is sufficient for me to say, that it does not present a case of that clear, palpable, violation of the constitution, that will warrant a court, having due regard to the rights of the legislature, and a proper diffidence of its own judgment in a case of conflicting opinions, to declare such a law null and void.

These are the views we entertain of the case before us. According to them, the act of assembly of 1845, is not unconstitutional; but the use to which it has been applied in this case, is not warranted by that act, and would render it, if such were the necessary construction to be placed on the law, plainly unconstitutional. I have endeavored to show that we are not driven to such a construction; but may give force and effect to that act, within reasonable limits, in perfect consistency with the constitution; and are, by no means, compelled to declare it a nullity. The result is, that the inquisition of damages returned in this case, ought to be set aside, and the plaintiff remitted to his rights, under such a construction of the act of 1845, as will not make it impair the obligation of the State's contract with the defendants, or violate the fundamental law of the land.

HOUSTON, *Judge ad litem.*—I concur in the opinion which hast just been announced by Judge Harrington. I concur in the reasoning, as well as in the conclusion to which it has conducted him, as to the several points embraced in that opinion. I have no doubt of the power of the legislature to authorize the obstruction and diversion of the navigation and flow of the White Clay creek, without providing for the assessment of damages to the owners of lands adjacent to it, who may be incidentally injured by such obstruction or diversion. It is conceded that the navigable parts of this stream lie entirely within the limits of the State of Delaware, and I consider that the power of the legislature to authorize the obstruction of such a water course, is settled by the decision of the Supreme Court of the U. S.,

in the case of Wilson *vs.* The Blackbird Creek Marsh Company, (2 *Pet. Rep.* 251.) The legislature having the power to authorize the obstruction of the navigation and flow of this creek without awarding damages to the owners of lands lying upon its borders, for consequential injuries resulting from it, and having authorized this company to obstruct the same in the mode prescribed by its charter and the supplement thereto, passed in 1837, without providing compensation for injuries of this nature, the company, in my opinion, has violated no private right, and was not liable to be sued for any such injury, provided it has erected and maintained the obstruction pursuant to the authority conferred upon it by the legislature. A consequential injury resulting from such a legal and authorized obstruction, is in the language of the books *damnum absque injuria,* which implies not only a loss without a remedy, but imports, in contemplation of law, a fictitious damage, which constitutes no cause of action whatever. If then the bridge was constructed and repaired by the company, in conformity with the provisions of its charter as originally granted and amended, the plaintiff in judgment of law, had no cause to complain of the obstruction, and had no right of action for any consequential injury resulting from it. This principle I conceive to be well established upon the authority and reasoning of Lansing *vs.* Smith and others, (8 *Cowen* 146,) and Hollister *vs.* The Union Company, (9 *Conn. Rep.* 436.)

But the counsel for the plaintiff has contended, that inasmuch as the legislature provided in the act incorporating the defendants, that the road should be constructed with the least possible injury to private property, they have transcended their authority and violated the terms of their charter, in erecting the bridge over White Clay creek, transversely across the current of the stream, and in constructing the embankments on either side of it, without culverts to vent the water from above in the event of an inundation. But without stopping to determine the probable meaning of this general and indefinite provision, whether it includes remote and consequential injuries, or refers only to such as should be direct and immediate, it is sufficient to remark, that when the legislature comes to provide in a subsequent section of the charter, for the erection of bridges over this and other streams necessary to be crossed in the line of the projected improvement, it imposes no such restrictions upon the company. On the contrary, when it proceeds to define with more certainty and precision, its meaning as to the mode of erecting the bridge over the White Clay creek, it simply requires in the first in-

stance, that it should be built with a draw, without prescribing at what angle it should cross the stream, or how the embankments should be constructed. This view is also confirmed by the law of 1837, which authorized the conversion of this drawbridge into a permanent bridge; for in this act the legislature seems to have recognized that the bridge was originally constructed in conformity with the charter of the company, since it requires, in case of its destruction, that it shall be rebuilt at the same place, of the same dimensions, and of the same width between the piers as the bridge first erected. Were this then the only point in the case, I should be clearly of opinion, that the act of 1845 infringes the rights and powers conferred upon the defendants, and would consequently be null and void. The legislature having the power, as I have already shown, to authorize the erection of this bridge over the White Clay creek, without providing compensation for consequential injuries resulting from it, and having seen proper to confer that authority upon the defendants without any such restrictions and conditions, it could not by a subsequent act make the company liable against its consent, for any such injury, without impairing the obligation of the contract implied in the charter between the State and the corporators. It is admitted by the counsel for the plaintiff, that a legislative grant, or charter, is a contract within the meaning of the tenth section of the first article of the Constitution of the United States, and the point is too well settled at this day to be successfully controverted. It is equally settled, that the imposing of new conditions and restrictions, inconsistent with the terms of the original grant or charter, without the consent of the grantee, impairs the obligation of the contract. This the legislature cannot do without violating one of the wisest and most salutary prohibitions contained in the Federal Constitution. So far then as the act of 1845 purports to give redress to Samuel Bailey and others, for consequential injuries resulting from the legal and authorized acts of the company, I am of opinion it is unconstitutional and void, and not binding upon the defendants, as they have never assented to or accepted it.

But it is admitted in the case stated, that the bridge which was partially destroyed, and rebuilt in 1839, was not rebuilt in exact conformity with the act of 1837. It is conceded that the piers of the bridge, as they now stand, and have stood since that time, occupy four feet more of the stream than they occupied in 1837, and when the bridge was originally constructed. This contraction of the space between the piers in 1839, was an act unauthorized by the legisla-

ture; for, whatever may have been the original power of the company over this matter, they saw fit in 1837, to accept a supplement to their charter, prescribing the precise place and manner in which the bridge should be rebuilt, in the event of its destruction; and in accepting that supplement, they must be held to have assented to all the restrictions and limitations which it imposes upon them. One of these restrictions is, that in case the bridge shall be destroyed, it shall be rebuilt with the same width between the piers, as the bridge first erected. This restriction, it seems, was directly violated by the defendants in repairing the bridge in 1839, and if Samuel Bailey has sustained any consequential injury, peculiar and personal to himself, by reason of this contraction in the space between the piers, in my opinion, it was competent for the legislature in 1845, to provide a remedy for such an existing injury, or for any future injury of the same description resulting from this unauthorized and illegal obstruction. The injury, however, must be peculiar and personal to himself, and not such as has been sustained by him, in common with other citizens of the State, whose privilege of using and navigating the creek, has been abridged or impaired by reason of this contraction. Such an invasion of a general right, or common privilege, without authority of law, would constitute a public wrong, and not a personal injury; and would be punishable only by indictment, and not by a private action at the suit of any individual. So far, therefore, as the act of 1845 was intended to embrace, or may be legally construed to embrace, any peculiar injury which has heretofore resulted, or may hereafter result to the plaintiff personally, from this unauthorized obstruction of the stream, I think it is constitutional and binding upon the company; and that we are bound to give it such a construction. For such an injury, if any such has happened to the plaintiff, he had a complete and subsisting right of action from the moment the injury occurred, and whether the cause of action was barred or not at the time the act of 1845 was passed, I apprehend is not material, as, viewed in this aspect, it is an act operating upon the remedy only, and not upon the right of the plaintiff. It is not in the power of the legislature to create a cause of action by retrospective legislation; that is to say, it is not in its power to make that which was lawful when done, unlawful after it is done. But where the act was originally unlawful, and the cause of action has accrued, the legislature may, I apprehend, control the remedy, and extend as well as limit the time for prosecuting the suit. Contemplated in this light, the act of 1845 does not affect or impair the obligation of any con-

tract between the State and the defendants; or seek to deprive them of any right vested in them, or to supply the plaintiff with a right of action where none before existed. It is upon the ground that they act merely upon the remedy, and not upon the obligation of the contract, that the constitutionality of acts of limitation has been vindicated and established. I am no apologist for retro-active legislation; and I admire the provision, to be found in some of the State constitutions, which prohibits the passage of retrospective laws generally. As a legislator, I should be exceedingly reluctant to exercise the power in any instance, except where it had for its object the quieting of just and equitable titles, and terminating law suits, instead of opening a door to increased litigation. But when called upon in my present capacity, to decide upon the authority of the legislature to pass such a law operating upon the remedy merely, I am not at liberty to consult the policy of the act; and as I can find nothing either in the Federal or State constitution which prohibits it, I am bound to hold, that the legislature possesses that power. The legislature of this State, as well as of every other State in the Union, I believe, has passed laws for quieting titles, and confirming defective sales and conveyances, which certainly go much further towards divesting vested rights, than any thing to be found in the act now under consideration; and the power of the legislature to pass such retrospective laws, has been adjudged upon argument to be constitutional, on the ground that they affect and relate to, the remedy only. In *Kent's Com.* 455, the law on this point, is very clearly, and, I apprehend, correctly stated. The learned commentator remarks, that "a retrospective statute, affecting and changing vested rights, is very generally considered in this country, as founded on unconstitutional principles, and consequently inoperative and void. But this doctrine is not understood to apply to remedial statutes, which may be of a retrospective nature, provided they do not impair contracts, or disturb absolute vested rights, and only go to confirm rights already existing, and in furtherance of the remedy, by curing defects, and adding to the means of enforcing existing obligations." I have already shown that with this construction given to the law in question, which confines it in its operation to peculiar and special injuries, resulting from the unauthorized contraction of the space between the piers of the bridge in 1839, it impairs no contract between the State and the corporators; and it is equally certain, it disturbs no vested right of the company; since it can claim exemption from liability for such injuries, only upon the plea of the statute

of limitation, which is purely remedial in its nature, and may be repealed at the will of the legislature. No person can ever acquire a vested right through a wrongful act, and by means of the statute of limitation, which will put it beyond the reach and control of the law-making power to change or alter it.

If then the act of 1845 be susceptible of such a construction as will reconcile it, either in whole or in part with the constitution, are we not bound to give it such a construction? I think we are upon the principle of *magis valeat quam pereat*, which applies in the construction of all statutes, as well as upon the authority of all the adjudged cases, which are numerous upon this point. A proper respect for the dignity of the legislature also requires that we should incline in favor of the validity of the act, unless it be clearly and unequivocally void. On this point we have in addition to the numerous authorities which have been cited on the part of the plaintiff, a decision of our own court to guide and direct us. In Jones *vs.* Wootten, (1 *Harr.* 77,) the court held, that where a statute is susceptible of two constructions, one of which will bring it in conflict, and the other harmonize it with the constitution, we are bound to give it the latter construction. But while I cordially subscribe to this doctrine, I have no doubt whatever of the power and authority of the court to declare an act of the legislature to be inoperative and void, where it clearly conflicts with the principles and provisions of our State constitution in any article, clause, or section of it. Ours is a government of limited powers, with co-ordinate departments, neither of which can be called supreme when compared with the others. The judicial department is just as supreme in the exercise of its legitimate authority, as the legislative department. Each has its appropriate duties assigned it by the constitution; and, both must act in subordination to all of its provisions, and are sworn to support and maintain it, when entering upon the discharge of their respective functions. It is the business of the legislature to make law; it is the province of the court to expound and administer it; and in administering the law, it is as much bound to observe its oath to support the constitution as the legislature is in making it; a breach of the constitution by the one, would not justify or excuse a breach of the constitution by the other; for they must both act upon their own judgment and upon their own responsibility, independently of each other. In expounding the laws of the State, the court is as much bound to expound them with reference to the constitution, as with reference to each other; for the constitution is a part of the law of

the State; and, as it is the supreme law, and the parent and arbiter of all the rest, the court must, of course, acknowledge its supremacy, and declare every act void, so far as it clearly conflicts with any one of its provisions. By the 1st sec. of the 6th art. of the amended constitution, it is provided that "the judicial power of this State shall be vested" in the several courts therein enumerated and provided for. Now what is the judicial power of this State? Certainly in it must be included the right and authority of the judges, to determine and decide every question of law, necessarily arising in the progress of a trial, of which the court has jurisdiction from the nature of the cause of action; for this is strictly and peculiarly a "judicial power." Every question of law, thus arising, is to be decided by the court, for that is the purpose for which it is created; while questions of fact are usually to be referred to a jury. Whenever, therefore, in the progress of a trial, a question arises as to the constitutionality of an act of the legislature, applying to the subject matter of the suit, it is a question of law, to be decided by the court having jurisdiction of the case; for the whole judicial power of the State over the suit, is by the express words of the constitution, delegated to the court having the jurisdiction of it. The object of a written constitution, is in the first place, to establish a government; and, in the next place, to define and circumscribe its powers, so as to preserve the harmony of its parts, and to prevent encroachments upon the rights reserved to the people. No one will contend, I presume, that if the legislature should pass an unconstitutional act, the people of the State would be bound to obey it; and yet, if the power does not reside in the courts to pronounce it void, as it would be, it is difficult to conceive how the people could resist the wrong and re-assert the majesty of the constitution, without a resort to physical force, in case the legislature should refuse to repeal it. A convention would not necessarily cure the evil, since the defect would not be in the constitution, but in a power professing to act in obedience to it. Such a construction and assumption would subject the whole fabric of the government, constitution and all, to the authority and control of the legislature; and would leave the people without any immediate and legal redress against its usurpations of power. Did the men who framed, and the people who have assented to the constitution, intend this? And did they not, by vesting the judicial power of the State in the courts established under it, which are the rightful interpreters of the constitution as well as the laws, mean to erect a peaceful and ever open tribunal for the redress of such abuses

whenever they may occur? Courts of justice are established to administer the laws; and I have already shown that whenever a dispute arises as to the constitutionality of a law in the administration of it, it is a judicial question, to be decided by the court; and yet, if the court has not the power as is contended, to pass upon this question, let us see into what an awkward position, not to say, absurdity, it would lead us. By the 17th section of the second article of the constitution of this State, it is provided, that " no act of incorporation, except for the renewal of existing corporations, shall be hereafter enacted without the concurrence of two-thirds of each branch of the legislature," &c. Suppose, for the sake of argument, the legislature were to pass an act of incorporation by less than a concurrence of two-thirds of each branch, say by a bare majority of both houses; and this fact should appear upon the journals. Suppose they were to order this act to be engrossed; to be signed by the speakers; and the same should be published as an authoritative act of the legislature. Suppose further, the persons obtaining this act were to proceed to organize a company under it; and should afterwards come into one of the courts of the State by their corporate name, to enforce the pretended rights conferred upon it; would any lawyer, or any man, contend that the court would be bound to recognize it as a lawful body politic, and thus lend its sanction to a flagrant and palpable violation of the constitution? Suppose the only fact put in issue by the pleadings in such a suit, should be the legal existence of the corporation. This would be a question of law, to be determined by the court on an inspection of the journals, and by referring the matter to the constitution. Would the court be bound in a such a case, to shut its eyes to both, out of a feeling of blind and insane deference for an imaginary superiorty of the legislative department, and overrule a plea sustained by the supreme and fundamental law of the State, and the formal record of the legislature? Such a question scarcely requires to be answered; for it is perfectly evident that no court which had a particle of respect for the constitution, or a single sentiment of regard for its own character, could ever consent to prostitute its powers, to give force and effect to such an absolute nullity of the legislature. To do this, the court and not the legislature, would have to make it a law. No law can execute itself; and as it came void from the hands of the legislature, it is manifest that the court would have to give it all the legal vitality which it possessed, by executing and enforcing it; and this would make it, in effect, rather the creature of the court, than of the legisla-

ture.  But it is unnecessary to argue this question; for, independent of the reason and necessity of the principle, it is too well settled by the whole weight and current of authorities in its favor, to be seriously disputed.

I do not consider the act in question objectionable on the ground relied upon in the argument, that it is an act of incorporation enacted by less than a concurrence of two-thirds of both branches of the legislature.  What constitutes an act of incorporation within the meaning of this clause in the constitution, has long been a quere among gentlemen of the legal profession; but certainly it is not every amendment or supplement to the charter of a company, which will amount to an act of incorporation.  Unless the act confers additional rights and franchises of a corporate nature; or confirms rights already existing in the company, there seems to be no reason for calling it an act of incorporation.  What will constitute an act of incorporation, must depend, I apprehend, in every instance, upon the nature and quality of the act in question.  But be this as it may, it is certain that the mere title of a law, can never make it an act of incorporation, for the simple reason, that the title is no part of the act, and has nothing to do with the interpretation or construction of it.  Now strip the law of 1845 of its title, and who would ever think of calling it an act of incorporation?  It has none of the qualities or characteristic features of such a law.  It does not pretend to incorporate those whom it enables to sue; and so far as it relates to the defendants, it is in the broad construction contended for by the plaintiff, rather an act to unmake than to make a corporation.

Nor do I consider the act objectionable on the ground that it is partial in its application, and affords a remedy, and mode of trial, unwarranted by the constitution, and the genius and spirit of our municipal regulations.  It is not necessary that a law should be general, in order to be constitutional.  Many of the laws which are passed at every session of the legislature, must from the very necessity of the case, be local and partial in their nature; and, to deny the legislature the right to pass such laws, would be to deprive it of one of its most useful powers of legislation at the present day.  Besides, it is difficult to perceive how the defendants can contend for such a restriction, without invalidating their own charter; since an act to authorize them to erect a bridge over the White Clay creek, and to maintain suits for trespasses against it, is just as partial in its character, as an act to authorize those who live upon the banks of the stream, and have been aggrieved by the improper ·construction of

the work, to maintain suits for injuries resulting from it. As to the last mentioned objection I have only to add, that the nature of the remedy, and the mode of trial, though somewhat novel in its application in the present instance, is not unknown to the laws and constitution of this State. The writ in the nature of a writ of ad quod damnum, has existed and been in use among us from an early period in our colonial government down to the present time. It has always been a remedy of special legislative grant, and seems to have been a favorite process with the legislature when about to authorize adverse proceedings against the property or possession of others. The legislature was in the habit of conferring it anterior to the adoption of the original and amended constitutions; and, as there is no restriction to be found in either instrument against it, we are bound to presume that the provision that "trial by jury shall be as heretofore," approves and justifies it. It was conferred upon the defendants by a provision of their charter, and upon the constitutional validity of it, depends their title to all the lands which they have found it necessary to condemn for the use of the company in this State.

Such are the conclusions to which I have arrived in relation to the several points of law which have been presented, and ably discussed, in the argument of this case. I think the law of 1845, in the broad sense contended for by the counsel for the plaintiff, is unconstitutional; in the limited construction and application which I have given it, I think it is not. If the plaintiff has sustained any peculiar and special injury in consequence of the contraction of the space between the piers of the bridge in 1839, I am of opinion that was a proper ground for the assessment of damages by the jury; but whether he has or has not, does not appear to the court. Neither the inquisition, nor the testimony taken upon it, shows this fact. Besides, it appears from the evidence accompanying the return, that the damages awarded to the plaintiff, were chiefly, if not solely, allowed for losses of which the plaintiff could not constitutionally complain; and, for these reasons, I am of opinion that the writ and the proceedings upon it should be set aside.

*Layton*, for plaintiff.

*Frame* and *Wales*, for defendants.